## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Cr. A. No.  12-16- LPS |
| v. | : | |
| | : | |
| WRONALD SCOTT BEST, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States hereby represents that it has reviewed the Probation Office's presentence report in this matter, and that it does not dispute any of the facts or factors set out therein. The Government also concurs in the Probation Office's calculation of the applicable Guidelines range of 37-46 months.

The Government respectfully requests that the Court impose a sentence of not less than 37 months of imprisonment, followed by 3 years of supervised release. The Government further respectfully requests that the Court impose a fine of between $69,000 (10% of the value of the stolen software obtained from Xiang Li) and $230,000 (10% of the value of the stolen software Defendant obtained from all cybercriminals).

## I.     APPLICATION OF SECTION 3553(a) FACTORS

### A.     Nature and Circumstances of the Offenses

Between September 2008 and May 2011, Defendant conspired with computer software crackers located in China and Russia to obtain and utilize unauthorized copies of industrial-grade software in the performance of government contracts for the military and law enforcement sectors. Defendant communicated electronically with approximately 35 different computer code

1

crackers and obtained over 60 pirated software applications from Chinese and Russian sources. He paid over $6,000 to obtain pirated software worth over $2.3 million, which he used for computer simulations on equipment his employer was designing for use in military helicopters, Patriot missile components, police radars and breath analysis equipment.

As explained below, this case is not the "no financial loss" fraud and victimless crime that Defendant mischaracterizes it as being. Def. Memo. at 2, 8. And Defendant was much more than a passive recipient of pirated software. He was an active participant in software cracking schemes, sharing installation information and legitimate software that he obtained through his position as "Chief Scientist" for a defense and law enforcement contractor with Chinese and Russian cybercriminals. While Defendant seeks to excuse his criminal conduct as resulting in no provable "lost sales," his digital theft and dissemination of sensitive, industrial-grade software to international cybercriminals held great value for him (and them) and has an undeniably negative impact on the rightful owners of the stolen intellectual property. Aside from his own use of the pirated software to perform on sensitive government contracts, Defendant has assisted in releasing these products -- in an unprotected and uncontrollable state -- into the wild of the Internet, where they can be used by anyone for anything. At a time when American businesses and other organizations are being victimized daily by widespread and systemic digital looting emanating from China, Russia and other parts of the world, Defendant has contributed to and supported the cause of cyber-looters.

1.      **Defendant's Cracking Activities with Chinese National Xiang Li**

In December 2009, Homeland Security Investigations Special Agents began investigating a website located at www.crack99.com, which advertised over 2,000 software products used in numerous applications including the electronics, mining, defense, aerospace, and petroleum

2

industries. The advertised software was pirated or "cracked," meaning that the software's licensing system files and other access and copy control features had been disabled, granting anyone in possession of it unlimited and unauthorized access to the software. That investigation culminated in the arrest and prosecution of Chinese national Xiang Li, who pled guilty to operating the software piracy ring on January 7, 2013. *See United States v. Xiang Li*, No. 10-112-LPS (D. Del.).

A review of Xiang Li's e-mail correspondence revealed that Defendant was one of Crack99's top customers in 2008 and 2009. Between November 2008 and June 2009, Defendant exchanged over 260 e-mails with Xiang Li, in which Defendant discussed purchasing, receiving or installing at least ten pirated software programs from Crack99. Through these unlawful transactions with Xiang Li, Defendant obtained the following pirated software applications:

| Date | Program | Est. Value |
|------|---------|-----------|
| November 21, 2008 | CST Studio Suite 2008 | $75,000 |
| November 23, 2008 | ADS 2008 | $228,000 |
| November 23, 2008 | ANSYS Multiphysics | $58,000 |
| November 23, 2008 | Mathematica 6.0.3 | $5,000 |
| November 23, 2008 | Autodesk Inventor 2008 | $7,000 |
| December 19, 2008 | ANSYS Service Pack I | $48,000 |
| January 5, 2009 | Genesys Eagleware 2008.07 | $29,000 |
| January 21, 2009 | Ansoft HFSS 11.1.1 | $49,000 |
| February 28, 2009 | Maxwell 12.0 | $35,000 |
| April 23, 2009 | CST Studio Suite 2009 | $75,000 |
| Total | | $609,000 |

This software has a broad range of applications, including electrical engineering, aerospace, telecommunications design and electronic design automation. These products are far different from the type of consumer entertainment products (like a movie or music file) often digitally pirated for the enjoyment of the passive consumer. Instead, these are industrial-grade, digital engineering tools used to design myriad products essential to daily life and the health and safety of the American public.

One of the more valuable products that Defendant obtained from Xiang Li was "Advanced Design System" (ADS), which is manufactured by Agilent Technologies. Agilent describes ADS as:

> … the world's leading electronic design automation software for RF, microwave, and high speed digital applications. In a powerful and easy-to-use interface, ADS pioneers the most innovative and commercially successful technologies, such as X-parameters and 3D EM simulators, used by leading companies in the wireless communication & networking and aerospace & defense industries. For WiMAX™, LTE, multi-gigabit per second data links, radar, & satellite applications, ADS provides full, standards-based design and verification with Wireless Libraries and circuit-system-EM co-simulation in an integrated platform.

Agilent Webpage (Ex. 1).

Another product that Defendant obtained from Xiang Li was "CST Studio Suite." This electromagnetic simulation software "is the culmination of many years of research and development into the most accurate and efficient computational solutions for electromagnetic designs." CST Website (Ex. 2). It includes CST Microwave Studio, which is "the leading edge tool for the fast and accurate 3D simulation of high frequency devices and market leader in Time Domain simulation. It enables the fast and accurate analysis of antennas, filters, couplers, planar and multi-layer structures and SI and EMC effects etc." *Id.* It also includes CST EM Studio, which is a "tool for the design and analysis of static and low frequency EM applications such as

4

motors, sensors, actuators, transformers, and shielding enclosures." *Id.* CST Particle Studio

"has been developed for the fully consistent simulation of free moving charged particles.

Applications include electron guns, cathode ray tubes, magnetrons, and wake fields." *Id.*

Defendant also obtained from Xiang Li leading products manufactured by Ansys, Inc., a

company that develops and globally markets engineering simulation software and services

widely used by engineers, designers, researchers and students across a broad spectrum of

industries and academia, including aerospace, automotive, manufacturing, electronics,

biomedical, energy and defense.   For instance, Defendant obtained Ansys's Multiphysics, a

product suite that:

> . . . allows engineers and designers to create virtual prototypes of their designs
> operating under real-world multiphysics conditions.  As the range of need for
> simulation expands, companies must be able to accurately predict how complex
> products will behave in real-world environments, where multiple types of coupled
> physics interact.  ANSYS multiphysics software enables engineers and scientists
> to simulate the interactions between structural mechanics, heat transfer, fluid flow
> and electromagnetics all within a single, unified engineering simulation
> environment. . . .

Ansys Website (Ex. 3); Video Simulation of World Trade Center Attack Using Ansys

Technology (Ex. 4).  Defendant also obtained Ansys's HFSS application, which Ansys describes

as:

> ... the industry-standard simulation tool for 3-D full-wave electromagnetic field
> simulation and is essential for the design of high-frequency and high-speed
> component design. HFSS offers multiple state-of-the-art solver technologies based
> on either the proven finite element method or the well-established integral
> equation method. You can select the appropriate solver for the type of simulation
> you are performing.
> . . . .
>
> Engineers rely on the accuracy, capacity, and performance of HFSS to design
> high-speed components including on-chip embedded passives, IC packages, PCB
> interconnects and high-frequency components such as antennas, RF/microwave
> components and biomedical devices.  With HFSS, engineers can extract scattering

matrix parameters (S,Y, Z parameters), visualize 3-D electromagnetic fields (near- and far-field) and generate ANSYS Full-Wave SPICE models that link to circuit simulations. Signal integrity engineers use HFSS within established EDA design flows to evaluate signal quality, including transmission path losses, reflection loss due to impedance mismatches, parasitic coupling and radiation.

Ansys Website, Ex. 3, at 3.

By Defendant's own admission, these software programs were highly valuable to Defendant in his work throughout his career. As Defendant wrote to Li early on in their online relationship, "I have used these codes for over 10 years, so I have a lot of work that I cannot access without the codes. This is why I have patiently been looking for a solution. I have paid people for solutions and received nothing in return, so I have lost both money and time." *See* Email from Best to Li, of 12/4/08, at 1 (Ex. 5). Defendant had been obtaining cracked software from other piracy groups, including "SHOOTERS," a group of individuals involved in the large scale cracking or theft of copyrighted software products. *See* Email from Best to SHOOTERS, of 11/4/08 (Ex. 6).

Defendant did more than just receive stolen software from Xiang Li. Defendant also provided Xiang Li with step-by-step instructions on how to install cracked software, essentially collaborating to successfully pick the digital locks securing the products. On November 18, 2008, for instance, Defendant attached a 14-page Microsoft Word document that served as a step-by-step tutorial – complete with screen shots – of how he tried to install the cracked CST Studio Suite given to him by "SHOOTERS." *See* Email from Best to Li, of 11/18/09 (Ex. 7). Pictured in these screen shots were CST Studio Suite's copyright warnings as well as Defendant's acknowledging this copyright language by clicking his mouse over the "Agree" button. *Id.* at 4-5.

Also pictured in the screenshots were file folders saved to Defendant's desktop and

bearing the names "DFAS Letters" and "NATO Specialist Meeting." *Id.* at 13. "DFAS" is an acronym for the Defense Finance and Accounting Service, the accounting firm of the United States Department of Defense. "NATO" is an acronym for the North Atlantic Treaty Organization, a military alliance of democratic states in Europe and North America. Such images serve as important reminders that this case involves a "Chief Scientist" holding a "secret" U.S. government security clearance, working for a military and law enforcement contractor, and carrying on criminal relationships with international cybercriminals. *See* PSR ¶ 38. By doing so, Defendant became the very epitome of a compromised individual known to those who posed an international threat to the United States.

On or about April 23, 2009, Defendant sent another e-mail to Xiang Li containing a 17-page Microsoft Word file attachment detailing his installation procedure for the CST Studio Suite 2009 software. *See* Email from Best to Li, of 4/23/09 (Ex. 8). These screen shots also contained CST's copyright disclaimers and a CST license agreement that stated: "This software and documentation may not be copied, reproduced, disclosed, transferred, or reduced to any form, including electronic medium or machine-readable form, or transmitted or publicly performed by any means, electronic or otherwise, unless CST consents in writing. It is strictly prohibited to reverse engineer, decompile, or disassemble the software." *Id.* at 3.

Some of the screen shots that Defendant sent to Xiang Li show his desktop computer screen and related computer folders. The folders include titles of numerous software programs such as ADS, Agilent, Ansoft, Ansys, Autodesk, MATLAB, CST, Cadence, Genesys and HFSS. *See id.* at 9-11. Defendant also has folders named for software cracking businesses including "XIANG LI krak" and "SHOOTERS." *Id.*

Defendant claims as an "asset" a "technical library" valued at $100,000. *See* PSR ¶ 90.

It is unclear, and Defendant has offered no explanation, whether Defendant acquired the contents of this "technical library" lawfully and whether he retains the lawful right to utilize these contents. If he does lawfully own the contents of this library, those contents certainly could be liquidated to satisfy all or part of the fine that the Government recommends.

Defendant also well understood the illegality of his actions. In a November 24, 2008 email exchange in which he sought to purchase eight cracked software programs from Xiang Li, Defendant noted the dangers of mailing a DVR containing pirated software from China to the United States: "Mailing a DVD-R is not a secure method for transferring these programs, and it violates a number of international laws. A FTP transfer is much easier and faster, and provides some level of security for both of us. Lets do it by FTP one program at a time, OK?" *See* Email from Best to Li, of 11/23/08, at 2 (Ex. 9).

### 2.    Defendant's Involvement with Other Crackers

Defendant's criminal involvement with software pirates was, by no means, limited to Xiang Li. Indeed, toward the end of their online relationship, Defendant argued with Li about whether cracked versions of certain Ansys products could be obtained. In January 2009, for instance, Defendant stated that he had been communicating with other suppliers of cracked software products who claimed to be able to provide "solutions" for the HFSS 11.1.3 and Maxwell 12.1 software programs. *See* Email from Best to Li, of 1/21/09 (Ex. 10). Defendant even sent Li links to several Chinese websites referencing the cracked Maxwell 12.1 software program and elicited Li's assistance in acquiring the cracked Maxwell 12.1 software program from China. Defendant threatened to go elsewhere if Li did not provide him with cracked versions of the software. *See id.*

And Defendant did go elsewhere. A review of Defendant's email account indicated:

8

- Defendant communicated with individuals at over thirty five different e-mail addresses about cracked software.

- In total, Defendant purchased or received over sixty (60) pirated software programs from various Chinese, Russian and Ukrainian sources of cracked software. *See* List of Cracked Software Purchased by Defendant (Ex. 11).

- Defendant made financial transfers totaling over $6,000 to these foreign-based cracked software vendors for software products and technical software installation instructions.

During this investigation, law enforcement agents discovered that Defendant had been communicating for several years with a Russian national (the "Russian Cracker") who cracked software and was connected to a network of other international cybercriminals. Defendant's relationship with this cracker involved: (1) paying the cracker to provide him with cracked copies of software that Defendant requested; and (2) providing the cracker with software Defendant obtained through his position as "Chief Scientist" for a government contractor. It is not clear if the Russian Cracker actually cracked the software or obtained it from other cybercriminals.

The following are some examples of Defendant's interactions with the Russian Cracker, which appear to have begun over one of Defendant's email accounts in March 2009:

- On March 26, 2009, Defendant sent an e-mail warning the Russian Cracker to avoid detection by a legitimate software manufacturer from using a cracked software application. Specifically, Defendant warned the Russian Cracker about monitoring of usage of the software through an access control system that had been circumvented by the cracked license file: "Be very careful when using Sonnet software. The program likes to send e-mail messages to Sonnet regarding your simulations . . . . They are provided with your IP address and e-mail address using this subroutine in Sonnet. This allows Sonnet to keep track of kraked software as well as legitimate versions of the software. Be cautious." *See* Email from Best, of 3/26/09 (Ex. 12). Defendant's employer subsequently confirmed that Defendant had access to Sonnet software at his office. *See* MPD List of Licensed Software (Ex. 13).

- On April 6, 2009, Defendant emailed the Russian Cracker instructions for installing the cracked version of the CST Studio Suite 2009 software. Defendant informed the Russian

Cracker that he could use these instructions for distribution to his other cracked software customers: "Feel free to use this Installation Procedure document for distribution to others who need to know how to install the code. My name should be removed from the last file that I sent to you." *See* Email from Best, of 4/6/09 (Ex. 14).

- In April 2009, Defendant provided the Russian Cracker with a legitimate license file for Mician 7 software, which is used in wireless communication applications. In this e-mail, Defendant wrote: "Here is my personal license file, so it is not for distribution." *See* Email from Best, of 4/15/09 (Ex. 15). A review of this electronic attachment reveals that this file lists the customer as: "MPD Components," Defendant's employer. *See id.* A prior email exchange between Defendant and a Mician employee makes clear that Defendant used his position at MPD, Inc. to acquire a license file for the Mician 7 software, which he then forwarded to a Russian cybercriminal for cracking. *See* Email to Best, of 4/15/09 (Ex. 16).

- In May 2009, Defendant uploaded several software programs to a file transfer protocol site controlled by the Russian Cracker. These programs included: Mician Wicomm Microwave Wizard, Ansoft NEXXIM 4.1.1, Ansoft Designer, HFSS 11.2 and Maxwell12.2. Defendant provided these files to the Russian Cracker for the purpose of allowing him the opportunity to create operational cracked versions of the programs. On June 13, 2009, Defendant wrote to that the Russian Cracker was able to provide working cracked software solutions for the Maxwell 12.2, Ansoft Designer 4.1.1 and the Ansoft NEXXIM 4.1.1. *See* Email from Best, of 6/13/09 (Ex. 17). All of these products have various uses in the field of electrical engineering.

- On one occasion when Defendant complained about the Russian Cracker requesting $100, the cracker reminded Defendant of the actual estimated retail value of a software application that he had given Defendant for free: "For info : HFSS by ANSYS-ANSOFT  75 000 USD and more..." *See* Email to Best, of 11/20/10 (Ex. 18).

- On April 28, 2011, Defendant sent an e-mail from his MPD, Inc. e-mail account to Volume Graphics, a Germany-based software company that produces 3-dimensional analysis and visualization software used in a wide variety of applications. *See* Email from Best, of 4/28/11 (Ex. 19). Defendant used his position at MPD to obtain an evaluation license for the VGStudio Max 2.1 software. After obtaining the evaluation license, Defendant uploaded a non-cracked copy of the VGStudio software to the Russian Cracker's FTP site. *See* Email from Best, of 5/2/11 (Ex. 20).

Defendant also sought to obtain export controlled software from his Russian Cracker.

For instance, Defendant repeatedly requested a cracked version of ATK Magic 2D or 3D

software, the dissemination of some modules of which are subject to export control laws and

regulations. This software has various applications in the design of electromagnetic devices and

has various military and civilian applications.  On July 29, 2009, the Russian Cracker emailed

Defendant a download link to a cracked version of ATK Magic software.  The Russian Cracker

stated that cracking this software was "a hard job" and referenced "AFOSR = Air Force Office of

Scientific Researches."  *See* Email to Best, of 7/29/09 (Ex. 21).

      Even after receiving ATK Magic 7.43 software, Defendant continued to request the

updated version of the ATK Magic 2D or 3D software.  The Russian Cracker expressed his

reluctance to transfer the updated ATK Magic software to Defendant on several occasions due to

the sensitivity of the software and its legal restrictions.  For example, when the Russian Cracker

stated that the software "has limitations for the export," Defendant responded: "It is used around

the world."  *See* Email from Best, of 8/15/10 (Ex. 22).  The Russian Cracker continued to object

to providing Defendant with the ATK Magic software, writing:  "Magic is the export-controlled

program and cannot be officially set in Russia."  *See* Email to Best, of 9/29/10 (Ex. 23).

Defendant pushed the Russian Cracker to get him the software, writing:  "Magik is used in both

Russia and China, so it exists at several universities and national labs."  *Id.*

      Agents subsequently asked Defendant about his interest in ATK Magic.  Defendant stated

that he requested this particular program from the Russian Cracker because it is the "gold

standard" in the field of simulating microwave tubes.  Defendant stated that he needed this

software to conduct microwave tube simulations.

      The extensive nature of Defendant's contacts and data sharing with software pirates also

illustrates a critical concern surrounding the use of pirated software obtained from Chinese and

Russian cybercriminals.  The software that Defendant received sometimes contained viruses or

malware that could compromise the functioning of the software (and thus, the results of any

engineering product on which it was utilized) or the data contained on the computers and networks of those who installed the products.

Several cracked programs that the Russian Cracker transmitted to Defendant contained malicious code. On May 29, 2009, for instance, the Russian Cracker sent Defendant an electronic attachment containing a cracked Ansoft program. After attempting to download this file, Defendant wrote to the Russian Cracker: "You are distributing a virus in every .exe file. Who wrote these patches?" *See* Email from Best, of 5/29/09 (Ex. 24). On September 22, 2009, the Russian Cracker sent Defendant numerous download links allowing Defendant to access a cracked version of the Corel Designer Technical Suite X4 software. After attempting to download these files and encountering a corrupted file, Defendant wrote to the Russian Cracker: "There is a Trojan Horse virus in the keygen.exe file. Can you remove or disable the Trojan Horse so I can use the keygen.exe file?" (Note: a "keygen" is a key generating software file that is used to generate a license key needed to access and operate the software.). *See* Email from Best, of 9/23/09 (Ex. 25). On April 13, 2010, the Russian Cracker sent Defendant another corrupted file included in links allowing Defendant to access the Adobe Creative Suite 5 Master Collection. Defendant wrote to the Russian Cracker: "There is a really nasty Trojan in these DVD ISO files." Why did you install a Trojan?" *See* Email from Best, of 4/13/10 (Ex. 26).

### 3.   Defendant's Use of Cracked Software to Work on Government Contracts

Defendant's involvement with cracked software obtained from Chinese and Russian cybercriminals must be understood in the context of his career as an engineer and scientist. We therefore briefly recount some of the key details of Defendant's career before explaining how he was using cracked software obtained from Chinese and Russian cybercriminals to design items used in the performance of government contracts.

Defendant holds a Master's Degree in Electrical Engineering from the University of Louisville, and a Ph.D. from the University of Utah. PSR ¶ 85. Early in his engineering career, Defendant worked for several different companies, including E.I. DuPont de Nemours and Company, in Wilmington, Delaware (from 1993-2001). *Id.* At DuPont, Defendant worked as a research associate on the Lycra and Kevlar product teams, where he performed computer modeling and simulations and trained employees on the use and maintenance of equipment used at DuPont's polymer plants. *Id.* ¶ 86.

In 2004, Defendant began work as a microwave engineer with a "Secret" security clearance at the Naval Surface Warfare Center, in Crane, Indiana. PSR ¶¶ 38, 87. His work involved researching techniques to defeat improvised explosive devices in the wars in Iraq and Afghanistan. *Id.* ¶ 87. Defendant told agents that while with the Navy, he had access to $500,000 worth of computer software programs that he would use to assist him in conducting his work, including, Ansoft Designer, HFSS (Ansys), E-physics and Multi-Physics. *Id.* ¶ 38. In 2007, Defendant's security clearance was revoked by the Department of Defense, due to his ties to Russian nationals. His employment with the Navy ended shortly thereafter, in early 2008. *Id.*

Defendant was subsequently hired in 2008 as "Chief Scientist" at MPD, Inc., in Owensboro, Kentucky. *Id.* MPD is a conglomerate of five companies that service the U.S. and foreign militaries and their contractors, avionics manufacturers, law enforcement organizations, industrial companies and commercial concerns with a variety of technology applications, equipment and weapons components. *See* MPD Website, at 1 (Ex. 26). MPD develops and manufactures microwave transmitters & transceivers, vacuum electron devices, precision ceramic/metal & metal components, and sensors & subassemblies. *See id.* at 2. Customers

13

served include aerospace, medical, industrial and communications original equipment manufacturers. *See id.*

MPD also designs and manufactures radar equipment for law enforcement agencies. The company states that it "has been a leader in the law enforcement radar market for more than twenty-five years . . . pioneer[ing] many of the features that have become standard on modern radars, including three-window displays, dual antennas, and directional radar technology." *See id.* at 3. MPD also markets in-car video systems for law enforcement.

MPD also claims to be "a leading manufacturer of breath alcohol testing instruments in the U.S., Canada, and around the world." *Id.* at 4. The company manufactures the Intoxilyzer brand of evidential instruments using infrared spectrometry alcohol detection technology. The Intoxilyzer 5000 instrument is used by a majority of U.S. state testing programs for evidential DUI enforcement. *Id.* The company also markets a complete line of handheld fuel-cell-based instruments that are used extensively in safety-related workplace alcohol testing programs and in nuclear power plant employee testing in the United States. *Id.*

As a requirement of his MPD employment, Defendant executed a "Software Code of Ethics" on July 28, 2008. *See* MPD Software Code of Ethics (Ex. 28). The Code required Defendant to "use software only in accordance with the license agreement" and states:

> MPD will not tolerate the use of any unauthorized copies of software at the company. Any person illegally reproducing software can be subject to civil and criminal penalties including fines and imprisonment. MPD does not condone illegal copying of software under any circumstances and anyone who makes, uses, or otherwise acquires unauthorized software shall be appropriately disciplined.

*Id.*

During his interview with law enforcement agents, Defendant admitted that he had been using the software programs that he purchased (from cracked vendors) for many years.

14

Defendant claimed that MPD would not supply him with the software he wished to use to perform his tasks as "Chief Scientist," so he obtained cracked versions of the software from Chinese and Russian cybercriminals. *Id.* ¶ 38. According to Defendant, MPD does not believe in computer-aided modeling when designing its products and instead does trial and error testing of its products without the aid of computer models. *Id.* Defendant further stated that MPD did not allow enough server space on his computer to conduct any computer software simulation. *Id.* Thus, he used cracked software installed on his personal computer system to perform the simulations on MPD projects. *Id.*

During the interview, Defendant told the agents that he used cracked software obtained from Xiang Li and the Russian Cracker to work on a number of different projects while at MPD, including revamping MPD's magnetron product line, Patriot missile components, police radars and breath analysis equipment. *Id.* ¶ 38. Defendant also told the agents he used some of the cracked software applications for cathode technology work at MPD, including redesigning the cathode for the military's Black Hawk helicopter. According to Defendant, he also worked on a vacuum tube used in military helicopters, including those used in the presidential helicopter fleet ("Marine One"). *Id.* ¶ 89.[1]

### B. Seriousness of Offenses, Promotion of Respect for the Law, Provision of Just Punishment, and Deterrence

Defendant's criminal conduct did not end until agents searched his home and office and seized computer equipment full of millions of dollars' worth of stolen software. The seriousness of Defendant's offense lies in both his theft of such specialized and expensive software and his

---

[1] In 2009, MPD applied for a "Secret" security clearance for Defendant, which was granted in 2010. PSR ¶ 38.

use of it on sensitive government contracts to design equipment used by the military and law

enforcement communities.

1.      **The Importance of Intellectual Property to the American Economy
and the Gravity of the Threat Posed by Intellectual Property Theft**

Intellectual property has become the keystone of the American economy.  As a recent

report issued by the United States Department of Commerce noted, "Innovation—the process

through which new ideas are generated and successfully introduced  in the marketplace—is a

primary driver of U.S. economic growth and national competitiveness. . . .  The granting and

protection of intellectual property rights is vital to promoting innovation and creativity and is an

essential element of our free-enterprise, market-based system."  U.S. Dep't of Commerce,

"Intellectual Property and the U.S. Economy:  Industries in Focus," v (March 2012)

http://www.esa.doc.gov/sites/default/files/reports/documents/ipandtheuseconomyindustriesinfoc

us.pdf ("DOC Report").  Without the protection of intellectual property laws, the creators of

intellectual property lose the economic benefits of their work, undermining incentives to invest

in the development of products that have become essential to our daily lives.  *See id.*  These

creators also are placed at a disadvantage vis-à-vis those who can just copy and use a product

developed by others without incurring any of the costs associated with developing that product.

The charged conspiracy illustrates the point perfectly.  Companies that spent millions of

dollars to develop very sophisticated, industrial-grade software had it stolen by Chinese and

Russian cybercriminals, sometimes within days or weeks of its release.  These international

pirates, in turn, sell cracked copies of the software back to American businesses and individuals,

like Defendant, who use it to design and manufacture products provided to governments,

16

businesses and consumers.  The international cybercriminals and their customers profit at the

expense of the software creators and those who use goods made with compromised digital tools.

As part of the Prioritizing Resources and Organization from Intellectual Property Act of

2008 (PRO-IP Act), Congress directed the executive branch to conduct an analysis of the threat

posed by intellectual property rights violations, including the costs to the United States economy

and threats to health, safety and national security.  In November 2011, the National Intellectual

Property Rights Coordination Center, an inter-agency task force established and led by the

United States Department of Homeland Security, Homeland Security Investigations, published a

global analysis of the IPR threat to the United States.  *See* National Intellectual Property Rights

Coordination Center, "Intellectual Property Rights Violations:  A Report on Threats to United

States Interests at Home and Abroad," (Nov. 2011), http://www.iprcenter.gov/reports/ipr-center-

reports/IPR%20Center%20Threat%20Report%20and%20Survey.pdf/view ("IPR Report").

Much of the information included below is taken from that report.

Internet-facilitated, intellectual property theft has become one of the most serious

criminal and economic problems facing our country.  Intellectual property theft negatively

affects the economic health of rights holders through lost profits, brand dilution, and

enforcement costs.  It has a similar negative effect on our national economy through the loss of

jobs, tax revenue and customs receipts.  The Department of Commerce has identified 75 "IP-

intensive" industries that account for 40 million jobs, or 27.7 percent of all jobs, in the United

States.  *See* IPR Report, at vii.  The same report noted that "IP-intensive industries accounted for

about $5.06 trillion in value added, or 34.8 percent of U.S. gross domestic product, in 2010."  *Id.*

Pirated software is especially pernicious because it is so easily reproduced and

disseminated in the relative anonymity of the Internet.  Online piracy is also an area of explosive

growth in the consumption of counterfeit goods by American consumers. The IPR Report
estimates that online piracy "currently accounts for between 6.5 and 12 percent of the total value
of infringing goods" and estimates the value of online piracy as possibly reaching $240 billion
by 2015. *See* IPR Report, at 18. The Crack99 operation alone, from which Defendant purchased
over $600,000 in pirated software, was responsible for distributing pirated software valued at
over $100 million in just over two years.

Pirated software is also particularly dangerous because it often is accompanied by
malware or viruses that can compromise the integrity and security of data stored or accessed
through computers or networks on which the pirated software is installed. This, in turn, can lead
to massive identity theft, financial fraud, cyber-espionage and other criminal conduct. As
Defendant's conduct so amply demonstrates, the Internet has fueled these threats, giving
criminals increased access to an bottomless victim pool, facilitating deception as to the nature of
the products supplied, and altering the ways in which counterfeit goods are moved to consumers.

Online intellectual property theft also poses a significant danger to public health and
safety. The use of pirated software that may not function properly in the design of equipment
and other goods used by the military, law enforcement agencies and other entities in critical
infrastructure creates a risk of significant physical injury. It also undermines the national
security of the United States and provides a potential funding source for international criminal
and terrorist organizations. There also is an ever-increasing threat to national security from
system failures or breaches of sensitive systems through back doors opened by pirated software
or counterfeit components.

A marketing video created and used by Ansys, Inc., one of the victim companies,
illustrates these concerns. *See* Ansys Video "Realize-Product-Promise" (Ex. 4). The narrator in

the video explains why Ansys's software is so essential to producing safe, reliable products for use by governments, businesses, and consumers.  After showing video of a cell phone, a jet engine, a motorcycle, wind turbines, and a child safety seat, the narrator explains:

> These products that protect our everyday lives . . . are promises, to your customers, to your shareholders, your colleagues, and to yourself, that the product you envisioned is the product you delivered, that there have been no compromises, that every what-if question, every idea and possibility about what each product can be and the promise it holds has been asked and answered with absolute and total confidence . . . .

*Id.*

## 2.    The Need to Punish and Deter Defendant and Other Software Pirates

Rather than obtain trial licenses to use the software he desired, or buying it himself, or convincing his employer to buy it, or finding a new employer who would buy it, Defendant instead chose to steal the software with the help of Chinese and Russian cybercriminals. Defendant then used compromised versions of this software obtained from international cybercriminals to design products for the U.S. military and law enforcement agencies – products employed in helicopters used by the President and Vice President of the United States, other senior government officials and our military personnel; and products employed by police officers to investigate crime and gather evidence against defendants in courts across the country.  *See* PSR ¶¶ 38, 89.

Defendant's excuses and rationalizations offer nothing that justifies a lesser sentence than that recommended by the Guidelines and the government.  Defendant's explanations are shifting and internally inconsistent.  In his interview with agents, for instance, Defendant initially told them that he used cracked software for keeping abreast of technology and for educational purposes, claims that he continues to make in his Sentencing Memorandum.  *See* PSR ¶ 38; Def.

19

Sentencing Memo at 2.  Defendant similarly told the probation officer that he bought the cracked software because "he was curious about computer modeling codes" and that his purchases were "motivated by intellectual curiosity."  PSR ¶¶ 52-53.  He further claimed to be using the cracked software solely to make recommendations to companies for solving specific classes of problems. *Id.* ¶ 52; Def. Sentencing Memo at 8-9.

In his interviews with agents and the probation office, though, Defendant ultimately admitted that he was using cracked software in connection with his work on MPD projects. Defendant told the agents that he used the programs to redesign the cathode for the Black Hawk helicopter.  *See* PSR ¶ 38.  He told the probation officer that he used the cracked software to "run virtual tests of products he developed at work, and that these virtual tests took less time than the conventional methods available to him [at MPD]."  *Id.* ¶ 52.

Defendant's claim that he stole the software only after MPD refused to purchase it for him or only to test it out before asking MPD to buy it is likewise specious.  MPD informed the government that it has a policy by which employees can formally request the purchase of software needed to perform company work.  According to MPD, Defendant made only one such request during his MPD employment.  That request was for certain Ansys products that would have cost the company $43,920 – hardly an amount that a government contractor earning tens of millions of dollars in revenue would find cost prohibitive.  *See* MPD Software Request from Best (Ex. 29).

Defendant's attempts at mitigation also fall flat when the entirety of his criminal conduct is considered.  Defendant did not just passively receive cracked software that he could not otherwise obtain (either to satisfy his intellectual curiosity or to perform MPD work).  As noted above, Defendant used his position as "Chief Scientist" at MPD to obtain trial licenses of various

20

software products that he then stole for unlimited future use. After using his status to obtain the trial licenses, he provided them to the Russian Cracker to crack. The payoff for Defendant was unlimited use of that software and additional software products supplied to him in the future at low cost. The payoff for the Russian Cracker was nominal payment from Defendant, but more importantly, retention of the software for distribution to whomever that Russian Cracker saw fit.

Defendant engaged in this conduct not simply because he wanted the software, but because he is an acolyte of software piracy. His communications with Li and the Russian Cracker are infused with tones of seemingly philosophical devotion to the crime of cracking. Defendant collaborated with the Russian Cracker and Xiang Li to develop written instructions for installing cracked software products (complete with screen shots). Indeed, Defendant even instructed the Russian Cracker to: "Feel free to use this Installation Procedure document for distribution to others who need to know how to install the code. My name should be removed from the last file that I sent to you." *See* Email from Best, Ex. 14.

On these facts, Defendant's claim that he bought cracked software only out of "curiosity" and to evaluate it for possible lawful purchase is ridiculous. Only by suspending common sense can one believe that Defendant stole valuable software solely to see if he wished to go back and lawfully purchase it. In Defendant's world, it would be acceptable to steal a car from the dealer's lot by picking the locks and taking it for a test drive, so long as the thief would later purchase it lawfully or at least return the car if he decided he did not wish to purchase it. Of course, there is no need to steal the car or the software. Both car dealers and software manufacturers allow potential customers to "test drive" their products before making a purchase decision. Indeed, Defendant did exactly that by obtaining trial licenses for a number of the software products at issue.

21

What eviscerates Defendant's weak justification is that he did not stop at the test drive. If he simply wanted to test drive the software he obtained on a trial basis through his MPD position before asking MPD to buy it, Defendant had no need to forward it on to a Russian cybercriminal for cracking and dissemination to other criminals. He certainly had no need to develop and memorialize step-by-step instructions for installing cracked software for the benefit of his software pirate brethren across the Internet.

Even as he prepares to stand before this Court for sentencing, Defendant's only real expression of regret lies in the consequences of getting caught, not in his decision to engage in the criminal acts. Instead of acknowledging the wrongfulness of his conduct, he "laments the loss of his security clearances" and the fact that his involvement with Chinese and Russian cybercriminals will cost him future employment opportunities. *See* PSR ¶ 54. In his sentencing memorandum, Defendant continues to espouse the view that his crimes were insignificant, because the government cannot show that any victim company would have sold an additional copy of their software if Defendant had not stolen it.

The critical flaw in Defendant's argument is that it ignores the *value* of the stolen software – both to him and to its lawful owner. Through his crimes, Defendant was unjustly enriched by obtaining software that was worth over $2.3 million on the open market and was extremely valuable to him. He did not collect this software as some type of perverse hobby. He used it to design products as "Chief Scientist" for a government contractor. He apparently could not function professionally without it.

The sentence recommended by the Guidelines and the government is driven by the "infringement amount" of the software piracy, not by the number of sales the victims otherwise can be shown to have made. *See* U.S. Sentencing Guidelines § 2B5.3(b)(1). Because cracked

software is simply a digital or electronic reproduction of protected software to which the access

and copy controls have been disabled, the Guidelines dictate that the "infringement amount"

equals the retail value of the authentic item multiplied by the number of infringing items

reproduced or distributed. *See id.* § 2B5.3 cmt. 2(A)(i)(II). This approach focuses on the harm

caused by the Defendant and his unjust enrichment, regardless of whether he displaced the

victim's legitimate sales. *See* U.S. Sentencing Guidelines App. C (2000) (Amendments 590,

593); *United States v. Powell*, No. 05-4064, 2005 WL 1670608, at *1 (4th Cir. July 19, 2005)

(affirming application of Section 2B5.3(b) infringement amount where defendant argued that

victim suffered "no pecuniary harm" or "loss" from copyright infringement).

Were the law otherwise, Defendant and other digital thieves could steal the most valuable

objects with impunity so long as a victim could not show a lost sale. Underlying Defendant's

view is the notion that the software Defendant stole was so valuable that there is only a limited

pool of buyers able to afford it. Because Defendant is not a market participant, the theory goes,

his stealing the software and providing it to others for unlimited distribution online really did not

alter the legitimate market. Using Defendant's perverse logic, stealing an extremely valuable

object is "victimless" so long as the victim cannot prove that it has lost a sale. Such a theory

turns the purpose of intellectual property law on its head by ignoring the value of the stolen

property to both the thief and the victim.

Even if the civil context, lost sales are but one measure of damage. Defendant ignores

the lost *value* of the products in the overall software market vis-à-vis competitors. Defendant

ignores the sunk costs related to the development, licensing and protection of those software

products. Defendant ignores the effect of brand dilution over time resulting from the release of

the software in an uncontrollable state to all with an Internet connection and the disposition to

23

steal it. As Defendant's conduct so aptly demonstrates, there are many who decide there is no need to legitimately purchase that which can be stolen with ease and with little likelihood of civil or criminal repercussion.

Defendant also ignores the disincentive to invent tomorrow's products if they can be silently stolen today and disseminated to all for essentially nothing. The market capitalization and value of today's business organizations is inextricably tied to their intellectual property. Indeed, the value of some of our largest and most important companies is largely, if not wholly, dependent on digital crown jewels. If those jewels are subject to looting without consequence, the very foundation of national and global economies is imperiled. In the end, the Court's agreement with such a claim would create an incentive to cybercriminals to up the ante and steal that which is most valuable, creating a dangerous precedent for potential victims of cybercrime.

The Court's sentence needs to illustrate that the seriousness of this crime lies as much in its nature as significant digital theft as it does in the breach of trust perpetrated during its commission. There is also a strong need to promote respect for intellectual property laws. The sentence also has to send a message to Defendant and the many others who blatantly engage in online software piracy – either as operators, customers or something in between – committing intellectual property crimes of this type is not a low-risk proposition.

### C. The Sentence Recommended by the Guidelines and the Government Will Not Create Unwarranted Disparities

Sentencing Defendant to at least 37 months of incarceration will not create an unwarranted disparity with similarly situated defendants. Defendant's reliance on a Sentencing Commission statistic relating to all "fraud" cases is so extremely vague and generalized as to provide no guidance to this Court in sentencing Defendant with his particular crimes.

24

What may provide some guidance, though, is a recent sentence imposed in this Court on another defendant for criminal copyright infringement involving consumer software. *See United States v. Jaime Lynn Snyder*, No. 11-97-SLR (D. Del.). It is the only sentencing in a criminal copyright infringement case in this district of which the undersigned are aware. In that case, Jaime Lynn Snyder was sentenced to 46 months in prison for operating a website through which she sold consumer software to individuals. For sentencing purposes, the Court adopted the plea agreement's stipulated loss value of $973,935.10, which was the defendant's gain from selling the software.[2] Although the Court declined to consider the figure for purposes of sentencing, the consumer software sold by Snyder was valued at approximately $5.9 million.

Like virtually all copyright infringement cases prosecuted to date, the Snyder case has obvious differences from the instant case. These differences, however, do not weaken the conclusion that imposing at least a 37-month sentence on Defendant would not be unfairly disparate. Snyder, for instance, was selling off-the-shelf consumer software products manufactured by such companies as Microsoft and Adobe. Her method of providing user access to the software was as simple as it comes: providing product keys to use during automated installation. This was nothing close to the sophisticated type of software cracking and installation that Defendant and his Chinese and Russian cohorts were undertaking.

Snyder certainly profited much more than Defendant through the sale and distribution of pirated software, and her distribution of thousands of titles is far different from Defendant's

---

[2]     On January 24, 2013, Snyder also was sentenced on an identity theft crime that she committed while on release pending sentencing in her criminal copyright infringement case. *See United States v. Jaime Lynn Snyder*, No. 12-52-SLR (D. Del.). The Court imposed a concurrent sentence of 46 months on the identity theft conviction, along with a consecutive sentence of 12 months of imprisonment under 18 U.S.C. § 3147. Snyder's total sentence of imprisonment was 58 months.

known distribution of a small number of products. Unlike Snyder, Defendant distributed tightly controlled, industrial-grade software to Chinese and Russian cybercriminals for cracking and dissemination to whomever they saw fit. Unlike Snyder, Defendant abused a position of trust at a government contractor to gain access to the software in the first place.

Most unlike Snyder, Defendant actually used the pirated software. And he used it for a purpose that potentially impacts the health and safety of Americans: design components for military helicopters, Patriot missiles, law enforcement radars and other equipment. *See* PSR ¶¶ 38, 89. Snyder's conduct may have duped some personal consumers or infected their computers with malware. That pales in comparison, though, to the risks associated with a "Chief Scientist" with a "secret" clearance working for a military and law enforcement contractor on sensitive design projects with cracked software he obtained from Chinese and Russian cybercriminals. To the best of the government's knowledge, no one involved in Snyder's scheme developed longstanding personal relationships with international cybercriminals to engage in large-scale digital theft. And to the best of the government's knowledge, no one who obtained pirated software from Snyder used it to design components for presidential helicopters.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court

impose a sentence of at least 37 months of imprisonment, a fine of between $69,000 and

$230,000, 3 years of supervised release and a $100 special assessment.

Respectfully submitted,

CHARLES M. OBERLY, III
United States Attorney

By:     /s/ David L. Hall
        David L. Hall
        Assistant United States Attorney


By:     /s/ Edward J. McAndrew
        Edward J. McAndrew
        Assistant United States Attorney


Dated:   March 1, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **Criminal Action No. 05-93-LPS** |
| WRONALD SCOTT BEST, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Sherry Kaminski, an employee with the United States Attorney's Office for the District

of Delaware, hereby certify that on the 1st day of March 2013, I caused to electronically file:

**Government's Sentencing Memorandum (with Exhibits 1 to 3, and 5 to 29)**

Said document is available for viewing and downloading from CM/ECF.

I, Sherry Kaminski, further certify that I caused to file with the Clerk of Court by hand

delivery the following:

**Exhibit 4 (Electronic Media) to the Government's Sentencing Memorandum**

I further certify a copy of the foregoing notice was sent via First Class Mail, to the attorney of

record as follows:

Edmond D. Lyons, Jr., Esq.
The Lyons Firm
1526 Gilpin Avenue
Wilmington, DE 19806


Sherry Kaminski